# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**NEIL MANDT,**

          **Plaintiff,**

      **v.**                               **Case No. 07-C-25**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
          **Defendant.**

---

## DECISION AND ORDER

In this action for judicial review under 42 U.S.C. § 405(g), plaintiff Neil Mandt challenges the denial of his application for social security disability benefits. In his application, plaintiff alleged that he was unable to work due to mental impairments and complications of diabetes. Specifically, he claimed that based on his combat experiences in the Vietnam War he developed post-traumatic stress disorder ("PTSD"), which limited his ability to concentrate and work with others, and that he also suffered from weakness and numbness related to type 2 diabetes.

The Social Security Administration ("SSA") denied plaintiff's application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. When the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final decision of the SSA for purposes of judicial review. See Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005).

Plaintiff claims that the ALJ erred in various respects in evaluating his claim, but on review of the decision and the entire record, I find no harmful error. Therefore, I affirm the

Commissioner's decision and dismiss plaintiff's action.

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review Standard

Judicial review under § 405(g) is limited to determining whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error.  Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion.  Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.  Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

Errors of law, on the other hand, may require reversal without regard to the volume of evidence in support of the factual findings.  Id.  However, even an error of law, if harmless, will not permit the reviewing court to upset the ALJ's decision.  Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006).  Such errors are harmless if, even under the proper legal standards, there is no reasonable possibility of a different result  on remand.  See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### B.    Disability Standard

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled.  Under this test, the ALJ must determine: (1) whether the claimant is presently

2

unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments;[1] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[2] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[3] and (5) if not, whether the claimant is able to perform any other work. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The claimant carries the burden of proof at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the

---

[1]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[2]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). In order to meet a Listing, the claimant must satisfy its specific "criteria." For example, the Listings of mental impairments consist of three sets of criteria: the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to work. Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). There are four broad areas in which the SSA rates the degree of functional limitation: (1) activities of daily living ("ADL's"); (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The SSA rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two areas. See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

3

"Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid to deny a claim if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision. E.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II. FACTS AND BACKGROUND

### A.   Plaintiff's Application and Procedural History

Plaintiff applied for benefits on July 6, 2004, alleging a disability onset date of December 11, 2003. In an accompanying report, plaintiff's counselor, Karen Gage-Worgull, wrote that she had seen plaintiff at the Milwaukee Vet Center related to his PTSD for the previous two years. She indicated that plaintiff suffered from severe sleep disturbance and intrusive, disturbing memories of his combat experience in Vietnam. She further indicated that he attempted to avoid such memories by self-medicating with alcohol. She stated that he had trouble getting along with others, including authority figures (Tr. at 55), was able to pay attention for just ten to fifteen minutes (Tr. at 53), and he handled stress and changes in routine poorly (Tr. at 54).

In a report he prepared, plaintiff wrote that his daily routine included watching TV, eating and performing household chores. (Tr. at 63.) He indicated that he slept very little, even with medications. (Tr. at 64.) He stated that he was able to care for himself but needed help with yard work. (Tr. at 65-66.) He indicated that his memory and concentration were limited due

4

to PTSD and his physical abilities were limited due to degenerative disc problems. (Tr. at 68.) Plaintiff reported taking various medications for depression, high blood pressure and sleep problems. (Tr. at 74; 80.)

As noted, the SSA denied plaintiff's application initially (Tr. at 20; 22) and on reconsideration (Tr. at 21; 28). Plaintiff requested a hearing (Tr. at 32), and on November 4, 2005, he appeared with counsel before ALJ Margaret O'Grady (Tr. at 33; 352).

## B. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified that his date of birth was July 23, 1949, he was unmarried, had no children, and lived with his nephew. (Tr. at 355.) He indicated that he had a high school education, with no additional vocational training. (Tr. at 356.) He testified that he last worked in December 2003, when, pursuant to a down-sizing, he was laid off from his laborer job for a company that made radiators. He indicated that his only income since then was from a VA pension. (Tr. at 356.) He later clarified he was receiving VA disability benefits for PTSD and diabetes. (Tr. at 366.)

Plaintiff testified that he felt pain in his right calf every day, lasting for fifteen to twenty minutes, which went away with rest but returned with walking. He also complained of pain when he used his right arm, which also went away with rest. (Tr at 358-59.) He further complained of back pain once or twice per month lasting fifteen minutes to one-half hour, for which he stood and walked around. (Tr. at 359-60.) He stated that he did not take pain medication. (Tr. at 362.) Plaintiff further testified that his hands fell asleep almost every day, particularly if he was holding the steering wheel of a car, and that his feet also fell asleep after

5

sitting for about one-half hour.  (Tr. at 366.)

Plaintiff stated that he experienced flashbacks and dreams related to his war service, and that about seven times per month he would be depressed to the point where he would not leave the house.  (Tr. at 367.)  He indicated that on a good night he slept for about three hours, even with medication.  At times he could be awake for two days, which he attributed to PTSD. (Tr. at 370.)  Plaintiff testified that none of his various medications helped him sleep.  (Tr. at 357-58.)  He stated that he no longer had to take medication for his diabetes because he watched his diet closely.  (Tr. at 371.)

Plaintiff testified that on a typical day he performed household chores, such as cleaning, washing dishes and doing laundry, but he did no yard work.  He indicated that he was able to care for his personal needs, read and watch TV, but he denied exercising or shopping.  (Tr. at 360.)  He indicated that he hunted about once per year.  He stated that he last drank alcohol in March 2004 and had received treatment for alcoholism at the Veteran's Administration ("VA").  (Tr. at 361; 364.)  The medical records referenced home remodeling work plaintiff was doing on his house, but plaintiff told the ALJ that his nephew's friend and hired workers did most of it.  (Tr. at 362.)  He stated that he helped paint for about twenty minutes at a stretch until his back and arm gave out.  (Tr. at 363; 369.)

Plaintiff testified that he was unable to work because he lacked the strength, his leg tightened up and he felt pain.  (Tr. at 362.)  He indicated that prior to his employer's down-sizing he was able to do the work, but that he suspected one of the reasons he was included in the reduction in force was because he was not keeping up the pace with others.  He attributed his difficulty to a loss of strength.  (Tr. at 365; 369-70.)  He testified that his symptoms were just as severe then, but he had to keep working to support himself.  (Tr. at

6

368.)

### 2. VE's Testimony

Plaintiff indicated that his past employment included spray painter, loading machine operator and delivery truck driver jobs, which the VE, Beth Hoynik, classified as medium to heavy, unskilled to semi-skilled work. She doubted that plaintiff had any transferable skills from these jobs. (Tr. at 374-75.)

The ALJ then asked the VE a series of hypothetical questions. The first assumed a person fifty-six years old, with a high school education, vocational history like plaintiff's, capable of medium work of an unskilled, routine, repetitive, simple, non-complex nature, with no public contact and limited interaction with co-workers. (Tr. at 375-76.) The VE believed that such a person could perform plaintiff's past spray painter and loading machine operator jobs. However, if by "non-complex" the ALJ meant to limit the person to work involving just one or two steps, those jobs could not be done. The VE opined that the hypothetical person could perform other jobs, though, such as electrical assembly and packaging work. (Tr. at 376-77.)

The ALJ then added a restriction of no constant use of the hands, and the VE replied that the assembly and packaging jobs could still be performed. However, if the person could use his hands only occasionally, he could not perform those jobs but could do other things such as custodial work. (Tr. at 377.) If the person needed a sit/stand option, about 25% of the assembly jobs could still be performed. (Tr. at 378-79.)

## C. Documentary Evidence

The ALJ received documentary evidence from plaintiff's treating professionals at the VA from December 2002 through October 2005, as well as the reports of consultants who

7

evaluated plaintiff's condition for the SSA.

### 1. VA Physical and Mental Health Treatment Records

On December 6, 2002, plaintiff saw psychiatrist Lilia Abad, stating that he felt anxious towards the end of the work day. He also complained of insomnia and indicated a willingness to try medication. He was at the time functional and working full-time. (Tr. at 199-200.) Plaintiff returned to Dr. Abad on February 19, 2003, stating that his depression and anxiety were much better. However, he indicated that he was still depressed for an entire day three to four times per month, and continued to experience trouble sleeping, flashbacks and intrusive thoughts of the war. Dr. Abad diagnosed depression with anxiety in partial remission with infrequent PTSD symptoms. Plaintiff also continued to drink too much. Dr. Abad provided medications. (Tr. at 198-99.)

Plaintiff saw Dr. Mohsin Qayyum on June 17, 2003, for follow up and reported doing well with no psychiatric problems. He also denied any side effects from his medication. (Tr. at 197-98.) He returned to Dr. Qayyum on September 29, complaining of poor sleep and anxiety, and indicating that his medication was less effective. Dr. Qayyum started plaintiff on new medications. (Tr. at 196-97.)

On January 7, 2004, plaintiff saw Dr. Phillip Benjakul for medication refills and reported no complaints or symptoms. (Tr. at 194-96.) On January 13, plaintiff returned to Dr. Qayyum, reporting that he had recently lost his job due to a downsizing and was looking for work. He reported coping with stress very well and abstaining from alcohol. He stated that his medications were helping, but his sleep was still poor. He denied side effects. Dr. Qayyum

8

continued plaintiff's medications and assessed a GAF of 55.[4] (Tr. at 194-94.)

On January 16, 2004, plaintiff established primary care with Dr. Patricia Stright. Plaintiff reported being diagnosed with diabetes two years previously and prescribed Glipizide, but he had never checked his blood sugar. He also reported taking Lisinopril for hypertension. He further reported taking several medications for depression and PTSD. On exam, plaintiff was alert and well groomed. Dr. Stright scheduled plaintiff to meet with a nurse for diabetes education and planned consults with mental health and an eye exam. (Tr. at 186-90.)

On February 5, plaintiff saw a nurse at the VA regarding his diabetes, and the nurse ordered testing supplies and instructed plaintiff on their use. The nurse also provided diet counseling. Plaintiff denied any numbness or tingling of the legs. (Tr. at 183-84.) Dr. Stright continued plaintiff's Glipizide for diabetes and Lisinopril for hypertension, and directed him to continue with mental health treatment. (Tr. at 185.) On February 24 and 26, plaintiff received education regarding his diabetes. (Tr. at 178-82.)

On March 8, plaintiff returned to the VA for follow up on his diabetes. His blood sugar readings were 40% within and 60% below the target range; none were above. Plaintiff was advised to avoid skipping meals and to evenly dispense calorie intake over the day. He reported occasional numbness in his left thigh and that his hands got numb if held in one position for too long. He reported an active lifestyle, walking for exercise. On March 18, Dr. Stright reduced plaintiff's Glipizide dosage. (Tr. at 175-77.)

_____

[4]GAF ("Global Assessment of Functioning") is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, a score of 31-40 denotes a major impairment, a score of 41-50 a serious impairment, and a score of 51-60 moderate impairment in occupational or social functioning. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

9

On March 25, plaintiff underwent a chest x-ray, which revealed a normal heart and pulmonary vessels but hyper-inflated lungs. (Tr. at 104.) On April 1, following an abnormal EKG, plaintiff completed a stress test, which was normal. (Tr. at 95-103; 175.) His exercise capacity was noted to be good for his age (Tr. at 112), although the test had to be terminated due to leg fatigue (Tr. at 173-74).

On April 15, plaintiff was seen by a nurse for follow up on his diabetes. His blood sugar readings were within the target range 62% of the time. He denied numbness or tingling in his legs or feet but displayed some hyper/nervous behavior during the exam. (Tr. at 166-68.)

On May 3, plaintiff saw his new psychiatrist, John Gillmore, and reported occasional intrusive thoughts, nightmares once per month and being easily startled. He indicated that he slept three hours per night and felt sad about seven days per month. On exam, his mood was intermittently anxious and sad. His thought process was logical and goal directed, and his cognition intact with the exception of poor memory of distant med changes. Dr. Gillmore diagnosed PTSD and depression, with a GAF of 50. He added a medication to help plaintiff with sleep. (Tr. at 155-56.)

On June 4, plaintiff saw a dietician, who noted that he ate irregularly and had lost weight. She attributed the weight loss to depression. She recommended more regular eating habits and a reduction in alcohol consumption. (Tr. at 134-35.)

On June 14, plaintiff returned to the VA for a check of his diabetes and denied any numbness or tingling in his legs or feet. However, his blood sugar readings were out of range about 50% of the time, and he was counseled about complications that could result from unstable glucose levels. (Tr. at 130-31.)

On July 16, plaintiff returned to Dr. Stright for follow-up on his depression, PTSD, alcohol

10

dependence and diabetes.  He denied any numbness or tingling, and his blood sugar readings were relatively normal.  He continued on various medications for depression and reported cutting back on his alcohol consumption.  (Tr. at 119-20.)  On exam, plaintiff was alert, not distressed and well-groomed.  Dr. Stright indicated that plaintiff no longer needed medication for his diabetes, and that his hypertension was controlled with medication, as was his depression and PTSD.  (Tr. at 121.)  Plaintiff saw the dietician on July 30 and appeared very anxious.  He reported trying to walk daily but getting leg cramps.  (Tr. at 246-47.)

Plaintiff returned to Dr. Gillmore on August 17, and indicated that the medication was not helping his sleep.  However, he stated that most days he was not sad.  On examination, he was intermittently anxious and sad, but his cognition and thought processes were intact.  Dr. Gillmore assessed a GAF of 50 and started plaintiff on another medication.  (Tr. at 239-41.)

Plaintiff saw the dietician on November 16 and reported losing weight after hunting and walking more.  (Tr. at 229-30.)  On January 25, 2005, plaintiff returned to Dr. Stright for follow up.  She noted that his diabetes was diet-controlled, and he denied any numbness or tingling.  His hypertension was likewise controlled with medication.  On exam, he did not appear to be in any distress and was well-groomed.  Dr. Stright continued his medications and directed him to follow up with the mental health unit.  (Tr. at 337-41.)

On January 27, plaintiff returned to Dr. Gillmore, who reiterated his diagnoses of PTSD and depressive disorder, with a GAF of 60.  He noted that since his last visit plaintiff's mood had improved, which plaintiff attributed to Wellbutrin and to his recent receipt of VA disability benefits.  However, plaintiff continued to complain of poor sleep.  On mental status exam, plaintiff presented as relaxed with euthymic mood.  Dr. Gilmore increased plaintiff's dosage of one medication and recommended that he re-start another to help sleep.  (Tr. at 335-37.)

11

Plaintiff returned to Dr. Gillmore on April 28, noting that his mood continued to be "pretty good." However, he still was not sleeping well and the new medications had not helped at all. On mental status exam, Dr. Gilmore found plaintiff's mood euthymic, with no difficulty in thought processes and a GAF of 60. Dr. Gillmore prescribed a new medication and scheduled a follow up for three months. (Tr. at 324-26.)

On May 13, plaintiff saw the dietician, reporting that he was doing well with glucose control and feeling "real good." (Tr. at 320.) He indicated that he was not able to walk as much in the winter, resulting in weight gain, but stated that his activity would increase with the home re-modeling projects he planned to do. He also reported eating a better diet. (Tr. at 320-21.)

Plaintiff returned to Dr. Gillmore on July 26 and reported doing relatively well, but with sleep still a problem. Dr. Gillmore found plaintiff's mood to be euthymic, assessed a GAF of 60, and continued his medications. (Tr. at 314-16.) Plaintiff also saw Dr. Stright on July 26, and she noted that his conditions were generally under control with diet and medication. She continued his current treatment regimen. (Tr. at 310-13.)

On October 18, plaintiff saw the dietician, complaining of left leg aching and tightening up after walking less than a block. He also reported that his foot was falling asleep. He admitted eating larger portions, resulting in weight gain. He stated that his activity level had decreased due to leg pain, and the nurse discussed exercise options with reduced leg involvement. Plaintiff indicated that he would be hunting soon, which would increase his activity level. (Tr. at 305-07.)

Plaintiff returned to Dr. Gillmore on October 26, with his main complaint remaining sleep. He was not anhedonic and reported going deer and turkey hunting the next weekend. Dr. Gillmore assessed a GAF of 50, adjusted plaintiff's medications, and scheduled a re-check for

12

three months.  (Tr. at 231-33.)

### 2. Alcohol Treatment Records

On April 2, 2004, following an arrest for drunk driving, defendant enrolled in an alcohol treatment program at the VA.  He reported drinking six to seven beers per day prior to his arrest. (Tr. at 109-10; 173.)  Thereafter, he attended group and individual counseling sessions.

On April 8, 2004, plaintiff attended an individual session, and appeared guarded with a somewhat anxious mood.  (Tr. at 171.)  He was found to meet the criteria for alcohol dependence and started in treatment.  (Tr. at 172.) On April 12 and 15, plaintiff attended group sessions and appeared invested in his recovery.  (Tr. at 166; 170-71.)  On April 19, plaintiff discussed his arrest, which apparently involved a blackout and a hit and run accident.  (Tr. at 165.)  On April 21, 22, 23, 26, 28 and 30, he attended educational and group sessions.  (Tr. at 156-57; 160-64.)

During a group session on April 30, plaintiff discussed his PTSD symptoms and the difficulties they posed for him as he tried to gain some serenity.  (Tr. at 157.)  On May 7, he reported trouble dealing with people due to his PTSD.  (Tr. at 152-53.)  On May 10, he participated in the group discussion but offered little self-disclosure.  (Tr at 151-52.)  Plaintiff reported abstinence and good support during a group session on May 12. (Tr. at 151.)  During the May 14 group session, the counselor indicated that it was difficult to assess plaintiff's progress because he shared little.  (Tr. at 147-48.)  On May 17, plaintiff discussed his arrest and was noted to be making moderate progress.  (Tr. at 146-47.)  On May 19, plaintiff's counselor reported minimal to moderate progress, as plaintiff continued to be quiet in the group.  (Tr. at 145-46.)  Plaintiff attended a group meeting on May 21 and was noted to be making moderate progress, with detailed plans for future activities.  (Tr. at 141-43.)  During a

13

May 24 group session plaintiff was active in the discussion and in no acute distress. (Tr. at 140-41.) On May 26, plaintiff attended a group session and actively participated. The counselor noted that plaintiff would be graduating from the program later that week. (Tr. at 138.) Plaintiff also attended an educational session on May 26 on the twelve-step program. (Tr. at 139-40.)

During a May 28, 2004, group session, plaintiff's counselor reported moderate progress in treatment goals and indicated that he was ready to move to the next level of care. (Tr at 137.) During a June 1 group session, plaintiff was attentive and responsive, and his counselor reported moderate progress. (Tr. at 136-37.) On June 3, he attended an educational session and participated in discussion. (Tr. at 135-36.) During a June 8 group session, plaintiff participated and claimed continued abstinence. (Tr. at 132-33.)

On June 14, 2004, during an individual session, plaintiff appeared guarded with a somewhat dysphoric mood after breaking up with his significant other. However, the counselor wrote that plaintiff was progressing nicely towards his treatment goals. (Tr. at 131-32.) On June 15, plaintiff's group counselor noted moderate progress. (Tr. at 127-28.) However, on June 21, plaintiff's counselor noted that plaintiff had made minimal progress and continued to drink, although he had reduced his intake. (Tr. at 118.) Plaintiff returned to the group on June 22, and the counselor noted moderate progress. (Tr. at 125-26.) In an individual session on June 22, plaintiff reported coping well with his diabetes but continued trouble sleeping. His affect was rather flat and his mood somewhat anxious. (Tr. at 126-27.) Plaintiff attended another group meeting on June 29 and expressed frustration about his financial situation. (Tr. at 124-25.) Plaintiff returned to the group on July 13, and the counselor noted moderate progress. However, plaintiff continued to be frustrated and to focus on the negative. (Tr. at

14

123-24.)

On July 27, 2004, plaintiff had an individual session with his counselor, complaining of problems such as bloody noses and cold sores when the weather changed. He stated that he was going to AA and working with his sponsor, but when confronted admitted that he still drank occasionally. He stated that drinking helped him cope, that his anti-depressants were not working, and that two to three days per week he wept, was apathetic and isolated himself. The counselor indicated that plaintiff was not progressing as well as previously thought. (Tr. at 249.) Plaintiff admitted continuing to drink in a group session that day. (Tr. at 248.)

Plaintiff returned to the group on August 3, 2004, and reported recently vacationing with his family. (Tr. at 245-46.) During an individual session on August 9, he seemed to be doing better and making a sincere effort to turn his life around. (Tr. at 244-45.) During the August 10 group, plaintiff reported trying to keep busy as boredom was a trigger for him. (Tr. at 243-44.) On August 17, plaintiff discussed his applications for disability benefits and stated that he did not see himself as employable at the time. (Tr. at 238-39.) On September 7, plaintiff indicated that he went for walks or visited family members when bored or upset. (Tr. at 237-38.) Plaintiff returned for group sessions on September 21 and 30, and seemed attentive and involved. He stated that he kept himself busy with chores around the house. (Tr. at 235-37.) On October 14, he discussed two recent deaths and expressed frustration over the house repairs he was undertaking. (Tr. at 234-35.) On October 21, he indicated that he was not sleeping well due to his PTSD. (Tr. at 233-34.) On November 4, plaintiff reported continuing to keep busy with home repairs and stated that he was walking for exercise, which helped his anxiety and depression. He seemed more optimistic. (Tr. at 230-31.) On December 2, plaintiff reported doing "real good," but on December 9 he presented as worried about his financial

15

problems. He reported that his medical problems prevented him from working, the nephew who lived with him paid no rent, and that he would have to sell his house if something did not change. (Tr. at 225-27.) However, on December 16, plaintiff reported receiving 100% VA disability and thus did not have to worry about selling his house or returning to work. (Tr. at 225.) On December 23, plaintiff reported feeling less stress since his VA benefits were approved, and he indicated that he was spending time on home repairs. The counselor noticed a decrease in anxiety and irritability. (Tr. at 345-46.) The counselor made similar observations on December 30. (Tr. at 344-45.)

On January 6, 2005, plaintiff again appeared to be doing much better since his financial worries were no longer an issue, and continued to work on home improvement projects. The therapist's impression was that he was "coping well." (Tr. at 343-44.) On January 20, the counselor noted moderate to significant progress, and plaintiff stated that he was coping better with anger and staying busy working on his house. (Tr. at 342-43.) On January 27, plaintiff reported that he was doing well and working on his house. (Tr. at 334.) On February 3 and 10, the counselor noted that plaintiff had made significant steps in his relapse prevention program and was doing well. (Tr. at 332-34.) On February 24, plaintiff reported to the group keeping busy with home repairs and attending twelve-step groups. (Tr. at 331.) On March 3, plaintiff stated that he continued to "keep himself busy with home repairs." (Tr. at 330.) The counselor's impression was that he was "doing well." (Tr. at 331.)

During a March 31, 2005, session, plaintiff complained of arm and leg problems, stating that he tried to walk for exercise but his legs began to cramp on him. The counselor advised him to talk to his doctor. (Tr. at 328-38.) On April 7, plaintiff reported doing "real well" coping with psycho-social stressors. He complained that he wanted his nephew, whom he considered

16

a free-loader, to move out of his house. (Tr. at 326-27.) Plaintiff again reported doing well on April 14, stating that he had gotten a loan to look for land up north. (Tr. at 326.) On April 28, plaintiff stated that he continued "to occupy his time with rather extensive home improvement projects." (Tr. at 323.)

In May 2005, plaintiff continued to do well with no expressed complaints, and continued to work on home improvements. (Tr. at 318-22.) On June 16, he complained of continued problems with his nephew but seemed to be coping in spite of them. (Tr. at 317-18.) On June 30, plaintiff reported feeling depressed the past week, which he related to worry about someone who recently had an operation. (Tr. at 316-17.) On July 28, he reported a recent vacation, which he enjoyed. (Tr. at 310.) On August 4, plaintiff stated that he was looking into deer hunting with a crossbow. (Tr. at 309-10.) On August 18, plaintiff reported that he continued to work on home improvements. (Tr. at 309.) On September 1, he complained of continued problems with his nephew. (Tr. at 308.) On September 29, he discussed his upcoming social security hearing and how he was looking forward to going turkey hunting. (Tr. at 307.)

### 3. VA Benefits Claim Reports

As noted, plaintiff also applied for benefits through the VA, and he was examined several times associated therewith. On June 10, 2002, he saw nurse practitioner Arlene Kasten related to his diabetes. Plaintiff reported some hand and leg numbness but denied loss of strength. (Tr. at 92.) He was able to move all extremities well and his strength was 5/5. A neurological exam was normal. Ms. Kasten diagnosed type 2 diabetes in excellent control with medication. (Tr. at 93.)

On June 12, 2002, plaintiff saw Victoria Wiese, Ph.D. in connection with his PTSD. He

17

reported numerous fire fights and a great deal of death and destruction during his time in Vietnam. He stated that he had worked in various capacities after discharge from the military, including as a general laborer at a shop that made radiators for the previous five years. He reported anxiety and thinking about Vietnam on a daily basis, with an exaggerated startle response. (Tr. at 90.) He reported panic attacks several years ago. On examination, plaintiff appeared extremely anxious but otherwise alert and oriented with grossly intact memory functions. However, his attention and concentration were adversely affected by anxiety, and he had limited insight. Dr. Wiese diagnosed plaintiff with PTSD and assigned a GAF of 35. (Tr. at 91.)

On March 25, 2004, plaintiff was re-evaluated by nurse practitioner Debbie Schwallie related to his type 2 diabetes. Defendant complained of insomnia and hearing voices at night, and occasional numbness and tingling in his fingers and hands, as well as left thigh numbness. However, on exam his muscle strength was 5/5 in his upper and lower extremities. (Tr. at 87-88.) Ms. Schwallie found no vocational limitations related to plaintiff's diabetes. (Tr. at 89.) She also found no service connected conditions that would affect or impose work restrictions on all fields of labor. She likewise found no current symptoms that would affect plaintiff's reliability, productivity or ability to concentrate or follow instructions, and no impairment of long- or short-term memory or judgment. (Tr. at 89.)

On April 8, 2004, plaintiff saw Michael Franklin, Ph.D. at the VA, stating that his PTSD was "pretty good" and had improved with treatment at the Milwaukee VA and Milwaukee Vet Center. However, his sleep disorder persisted, even with medication. He also complained of an exaggerated startle response based on environmental stimuli (e.g., backfiring cars) that reminded him of Vietnam. He reported abstinence from alcohol following a recent drunk driving

18

arrest. (Tr. at 83.) Plaintiff stated that he had been laid off from his job in December 2003, and that he had been unable to find replacement employment. He was at the time receiving unemployment compensation. His only other income was a 60% service-connected VA pension. Plaintiff reported less strength due to his diabetes, and that his hands had a tendency to go to sleep. Plaintiff was at the time taking several medications for PTSD and reported no side effects. He stated that he attempted to walk daily for exercise and had quit drinking and smoking. (Tr. at 84.) On mental status exam, Dr. Franklin found plaintiff cooperative, with good eye contact, and independent in all activities of daily living. His mood was euthymic, and there was no evidence or complaint of memory loss. (Tr. at 85.) Plaintiff indicated that his residual PTSD symptoms of insomnia made it more difficult to get out of bed in the morning but added that he had gone to work over the years despite these symptoms because he could not afford to miss work. Dr. Franklin opined that plaintiff's GAF was 55, and that he was capable of managing any benefit payments. (Tr. at 86.)

### 4. SSA Consultants' Reports

The SSA also arranged for plaintiff's social security application to be evaluated by two psychologists. On August 17, 2004, Roger Rattan, Ph.D., completed a psychiatric review technique form, finding the presence of A criteria under Listings 12.04, Affective Disorders, 12.06, Anxiety-Related Disorders, and 12.09, Substance Addiction Disorders. (Tr. at 201-09.) Under the B criteria, Dr. Rattan found mild limitation of ADL's, moderate limitation in social functioning, mild limitation in concentration, persistence and pace, and no episodes of decompensation. (Tr. at 211.) He found the presence of no C criteria. (Tr. at 212.) In an accompanying mental RFC report, Dr. Rattan found moderate limitations in some areas, no significant limitations in others. (Tr. at 215-16.) On January 12, 2005, Robert Hodes, Ph.D.,

19

reviewed and affirmed Dr. Rattan's assessments.  (Tr. at 201; 217.)

**D.    ALJ's Decision**

Based on this evidence, on February 21, 2006, the ALJ issued an unfavorable decision. (Tr. at 10.)  She found that plaintiff had not engaged in substantial gainful activity since December 11, 2003, his alleged onset date, and that he suffered from severe impairments including post-traumatic stress disorder, depression, alcohol dependence, diabetes and hypertension.  (Tr. at 14-15.)  However, the ALJ found that none of these impairments met or equaled a Listing.  At step four, the ALJ concluded that plaintiff retained the RFC for simple, routine work at the medium exertional level, which did not involve public contact and only limited interaction with co-workers and supervisors.  Based on this RFC, the ALJ concluded that plaintiff could not perform his past work, which was medium to heavy.  (Tr. at 16.) However, relying on the testimony of the VE and using Grid Rules 203.07 and 203.15 as a framework, the ALJ found that plaintiff could perform other jobs such as production worker and packager.  (Tr. at 17.)  Therefore, she found him not disabled and denied the application.  (Tr. at 18.)

Plaintiff sought review (Tr. at 349-50), but on November 6, 2006, the Appeals Council denied his request (Tr. at 3).[5]  The present action followed.

### III.  DISCUSSION

Plaintiff argues that the ALJ (1) failed to properly consider whether his mental impairments met a Listing; (2) improperly evaluated treating physician statements; (3) failed to follow the appropriate standards in determining RFC; (4) erred in evaluating the credibility

---

[5]Plaintiff attached to his appeal a letter from another counselor at the Vet Center, who indicated that plaintiff's chronic PTSD symptoms prevented him from working.  (Tr. at 351.)

20

of his testimony; (5) failed to follow proper legal standards in assessing the VE's testimony; and (6) failed to consider the VA's disability determination. I address each argument in turn.

## A.      Listings

Plaintiff first argues that the ALJ failed to properly consider the mental impairment Listings. He notes that the ALJ failed to specifically identify the Listings she considered and argues that she did not build a bridge from the evidence to her conclusion. See Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."); see also Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005) ("In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion.").

As is pertinent to this issue, the ALJ wrote:

> [Plaintiff's] impairments do not meet or equal the requirements for any impairment or combination of impairments in the Listings of Impairments. In reaching these conclusions, the undersigned considered the opinions of those who previously evaluated these issues, but who did not have the benefit of some of the above noted evidence.

(Tr. at 15.) While the ALJ certainly could have explained herself better, I cannot conclude that she committed reversible error in this regard.

It appears plain that in referring to "those who previously evaluated these issues" the ALJ meant the consultants, Drs. Rattan and Hodes. As discussed above, those doctors opined that plaintiff had mild to moderate limitations under the B criteria of Listings 12.04 and 12.06, and thus did not meet those Listings.[6]  (Tr. at 211.)

---

[6]The ALJ later made findings on the B criteria consistent with the consultants' reports. (Tr. at 16.) Plaintiff complains that the ALJ said only that she "considered" these reports, not

21

Plaintiff argues that the ALJ could not rely on the consultants because they did not see the entire record and did not examine him. It is true that a non-examining consultant's report alone generally does not constitute substantial evidence on a disputed issue. See Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). However, plaintiff points to no contrary medical opinions in the record. In the absence of contrary evidence, the ALJ was allowed to rely on the consultants. See Sienkiewicz v. Barnhart, 409 F.3d 798, 803 (7th Cir. 2005) (affirming ALJ's reliance on consulting physicians who reviewed the claimant's records where "no doctor ever suggested that any greater limitation was required");[7] Scott v. Sullivan, 898 F.2d 519, 524 (7th Cir. 1990) (affirming ALJ's reliance on state agency consultant, who was the only doctor to render an opinion on the Listings). Nor does plaintiff point to evidence demonstrating deterioration in his condition after August 2004 and January 2005, when the consultants reviewed the record, which would render their opinions suspect.[8] Indeed, it appears that plaintiff's condition improved in 2005. (See, e.g., Tr. at 314-16; 324-26.) Thus, the ALJ was permitted to rely on these reports.[9]

─────────────────────

that she "relied" on them. However, I must "give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it." Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000) (internal quote marks omitted).

[7]Plaintiff argues that Sienkiewicz is distinguishable because in that case the ALJ specifically considered and gave weight to the consultants' reports. However, as discussed above, the ALJ made sufficiently clear her reliance on these reports in the present case.

[8]Plaintiff claims that his later receipt of 100% disabled VA benefits demonstrates a deterioration in his condition. However, as I will discuss later in this decision, the VA decision awarding such benefits is not in the record. Thus, the ALJ could not consider it. The VA medical records do not, as discussed in the text, demonstrate a worsening in plaintiff's condition.

[9]Plaintiff argues that SSR 96-6p required the ALJ to get an updated report on medical equivalence based on the evidence post-dating the consultants' reports. However, SSR 96-6p

22

Moreover, plaintiff makes no attempt to show that he, in fact, meets a Listing. See Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)) (stating that the claimant bears the burden of demonstrating that his impairments meet a Listing). Thus, any error the ALJ made in failing to sufficiently articulate the basis for her step three finding in this case is harmless. See Sanchez, 467 F.3d at 1082-83 (stating that an ALJ's failure to explain her finding on the Listings will ordinarily require remand, but remand was not required in that case because there was no medical evidence that the claimant met the Listing at issue); Terrell v. Barnhart, No. 1:05-cv-1690, 2007 U.S. Dist. LEXIS 8565, at *16-17 (S.D. Ind. Jan. 5, 2007) (noting that although an ALJ must, in the face of conflicting evidence, discuss specific Listings, remand is not required simply because the ALJ failed to mention a specific Listing or where the claimant makes no showing that he meets or equals a Listing).

Plaintiff is not entitled to reversal simply because the ALJ failed to mention the relevant Listings by number. See Rice v. Barnhart, 384 F.3d 363, 369-70 (7th Cir. 2004) ("As to Rice's argument that the ALJ's failure to explicitly refer to the relevant listing alone necessitates reversal and remand, we have not yet so held and decline to do so here."). Likewise, plaintiff's argument that the ALJ failed to follow SSR 96-9p – which sets forth standards for evaluating consultants' opinions – goes nowhere because the consultants did not support his claim.

_____

requires an updated report only if, in the opinion of the ALJ, additional medical evidence that may change the consultant's finding is received. See U'Ren v. Apfel, No. 99-35604, 2000 U.S. App. LEXIS 31192, at *6-7 (9th Cir. Dec. 1, 2000) (noting that SSR 96-6p affords the ALJ discretion in deciding whether to obtain an updated report); see also Foley v. Barnhart, 432 F. Supp. 2d 465, 483 (M.D. Pa. 2005) (stating that although the ALJ found the consultants' reports outdated, it was "within her discretion to find that no new medical opinion was required").

23

Therefore, remanding for further explication of the weight given their reports would serve no useful purpose.[10]

**B.      Treating Source Reports**

Plaintiff next argues that the ALJ failed to properly consider statements from his treating physicians at the VA.  He points to the diagnosis of PTSD with a GAF of 35 in June 2002, and similar diagnoses and GAF scores of 55 in November 2002, June 2003, September 2003, January 2004 and April 2004.   He further points to Dr. Gillmore's findings of sleep problems and GAF scores of 50-60 in 2004 and 2005.  Finally, he points to a record indicating that he had seven "bad days" per month, just as he testified.  (Tr. at 154-55.)  He contends that the ALJ failed to consider this evidence from the treatment records, instead considering only those statements supporting her conclusions.

Medical opinions from treating sources are entitled to special consideration in social security cases.  Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001).  SSR 96-2p explains that if such an opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" and "'not inconsistent' with the other 'substantial evidence'

---

[10]Plaintiff notes that the ALJ could not rely on Dr. Rattan's report in evaluating his diabetes because, as a psychologist, Rattan was not qualified to render an opinion on that condition.  However, plaintiff points to no evidence demonstrating that he meets any Listings related to diabetes.  In fact, VA nurse practitioner Schwallie opined that plaintiff had "no vocational limitations related to [his] diabetes."  (Tr. at 89.)  Plaintiff attempts to distinguish this report because Schwallie was considering a "service-connected" disability claim, and he did not have to prove a military service connection to obtain social security disability.  However, there is no  basis in Ms. Schwallie's report for drawing such a distinction.  After stating without reservation that plaintiff had "no vocational limitations related to [his] diabetes," Schwallie stated in the very next sentence: "There [are] no service connected conditions that would effect or impose work restrictions in all fields of labor . . . at this time."  (Tr. at 89.)  Thus, Schwallie demonstrated that she could distinguish between service connected and non-service connected conditions when she wanted to.  Her report clearly stated that plaintiff had no limitations related to his diabetes, service related or not.

24

in the individual's case record," the ALJ must afford it "controlling weight." If the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d).

SSR 92-2p further explains:

It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not. Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source.

In the present case, the ALJ reviewed plaintiff's treatment records from the VA and accepted that he suffered from severe PTSD. (Tr. at 14-15.) It is true that she did not specifically mention the GAF scores, but it is well-settled that the ALJ need not review in writing every piece of evidence in the record. E.g., Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005); Rice, 384 F.3d at 370. The ALJ did not skip an entire line of evidence supporting plaintiff's claim, see, e.g., Briscoe v. Barnhart, 425 F.3d 345, 354 (7th Cir. 2005), and for the reasons that follow, the ALJ's failure to discuss the specific entries plaintiff mentions does not warrant remand.

In June 2002, Dr. Wiese assessed a GAF of 35, which is indicative of a major impairment. (Tr. at 90-91.) However, this assessment occurred two years prior to plaintiff's application for social security disability, and one and one-half years prior to his alleged disability

25

onset date. Further, it is undisputed that plaintiff was working full-time when Dr. Wiese made this assessment. Thus, I cannot conclude that the ALJ committed harmful error in failing to discuss this specific evidence.[11]

Other physicians at the VA assessed GAF scores in the 50-60 range during the relevant time period,[12] but they did not note significant problems in memory or concentration. (E.g., Tr. at 155-56.) Nor did they suggest any work restrictions based on plaintiff's sleep problems. Further, as the ALJ noted, plaintiff's condition seemed to improve with treatment. (Tr. at 335-37.) Plaintiff advised his counselors at one point that he was sad about seven days per month, but the ALJ was not required to conclude from this self-report that he was unable to work on those days. See Farrell v. Sullivan, 878 F.2d 985, 989 (7th Cir. 1989) ("The ALJ also determined that Dr. Zasadny's observations were mere recitations of Farrell's complaints, not the objective observations required by the Listings.").

Finally, as the Commissioner notes, none of plaintiff's VA doctors imposed specific work limitations inconsistent with the ALJ's RFC finding or opined that plaintiff was unable to work after his alleged onset of disability. Therefore, plaintiff has failed to demonstrate any reasonable likelihood of a different outcome should I remand the case for further exploration of the treating source records.

## C.    Mental RFC

Plaintiff next argues that the ALJ failed to include a function-by-function assessment of his mental RFC. As noted above, the ALJ limited plaintiff to simple, routine work, which did not

------------------------

[11]On December 6, 2002, Dr. Abad found that plaintiff was functional and working full-time. (Tr. at 199-200.)

[12]Such scores are generally indicative of moderate symptoms.

26

involve public contact and only limited interaction with co-workers and supervisors. Plaintiff faults the ALJ for not specifically discussing his ability to understand and remember instructions and procedures, maintain concentration and punctuality, interact with others, and adapt to changes in the work setting, the mental abilities needed for unskilled work. See Windus, 345 F. Supp. 2d at 931 (citing SSR 85-16; POMS DI 25020.010B.3). He notes that Dr. Rattan found moderate limitations in several of these areas, which the ALJ did not discuss.

As I have discussed in previous cases, while SSR 96-8p plainly requires a function-by-function assessment of a claimant's physical abilities before RFC may be expressed in terms of the exertional levels of work (i.e., sedentary, light, medium, heavy, and very heavy), the ruling "is less than clear on what an ALJ is required to do when explaining mental RFC." Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1036 n.27 (E.D. Wis. 2004). In any event, even if the ALJ should have more fully explained her mental RFC assessment in light of Dr. Rattan's report, there is no reason for remand. Plaintiff fails to demonstrate that Dr. Rattan's RFC conclusion differs from the ALJ's, and there is no reason to believe that further consideration of the "moderate" limitations Dr. Rattan imposed would lead to a different result. See Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002) (affirming denial of claim where consultant found that the claimant was "moderately limited" in his ability to maintain a regular schedule and attendance, and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, but translated those findings into a specific RFC that the claimant could still perform low-stress, repetitive work).

## D.    Credibility

Plaintiff further argues that the ALJ failed to make a proper determination on the credibility of his testimony. Generally, the court must defer to an ALJ's credibility determination

27

because she had the opportunity to personally observe the claimant's demeanor at the hearing. Windus, 345 F. Supp. 2d at 945. Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).

However, in order to benefit from this deferential standard, the ALJ must sufficiently articulate the reasons for her credibility determination. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003) (citing SSR 96-7p). Further, the ALJ must comply with the requirements of SSR 96-7p in evaluating credibility. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003). That Ruling directs the ALJ to consider the medical evidence; the claimant's daily activities; the location, duration, frequency and intensity of the pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant uses; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. While the ALJ need not elaborate on each of these factors when making a credibility determination, she must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Windus, 345 F. Supp. 2d at 946.

Plaintiff quotes the ALJ's finding that when his "subjective complaints and allegations about his limitations are considered in light of all the objective medical evidence as well as the record as a whole, they do not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful work activity." (Tr. at 17.) He argues that this finding is insufficiently explained, and that it is not really a credibility determination, to which the court must defer, but rather a finding regarding capacity to perform work. See Peterson v. Chater, 96 F.3d 1015, 1016 (7th Cir. 1996). However, the quoted statement does not constitute the

28

entirety of the ALJ's conclusion on credibility. In the body of her decision, the ALJ also stated:

> When the claimant's complaints and allegations about limitations and impairments are considered in light of all of the objective medical evidence as well as the record as a whole, they do not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful work activity. The medical records document the claimant's treatment for his impairments, as discussed above. The claimant's alcohol abuse has been in remission since March 2004. The claimant attended an alcohol treatment program and AA. Despite some complaints of pain as noted above, the claimant does not take any pain medication and has not received treatment for such complaints. His diabetes is well controlled by his diet and his hypertension is managed with medication. The claimant does not have side effects from medication. The claimant's mental conditions appear stable with his ongoing treatment and medication. The claimant maintains a significant focus on maintaining sobriety. His mental impairments moderately limit his concentration, but only mildly limit his daily and social functioning. The claimant has not experienced episodes of decompensation of extended duration. The claimant's complaints are out of proportion to the objective medical findings. The claimant's impairments do not preclude him from engaging in various daily activities and performing home-improvement projects, despite his downplaying of these projects at the hearing. Overall, the claimant's complaints suggest a greater severity of impairment than is shown by the objective medical evidence and all of the above noted factors.

(Tr. at 16.)

This credibility finding is sufficient. It discusses most of the factors set forth in SSR 96-7p, including the objective medical evidence, plaintiff's ADL's, the nature of plaintiff's pain, his use of medication and any side effects therefrom, and treatment other than medication. Further, substantial evidence supports the ALJ's conclusions. Plaintiff's alcoholism was in remission (Tr. at 231); he received no specific treatment for pain (Tr. at 362); his diabetes was controlled by diet and his hypertension by medication (Tr. at 339); he experienced no side effects from medication (Tr. at 197-98); his mental impairments were stable with treatment (Tr. at 324-26); and he engaged in various daily activities, including cooking and caring for himself, cleaning and doing laundry, hunting year round, and completing significant home improvement projects. Plaintiff testified that he personally did little work on his home (Tr. at 362-63), but the

29

record contains ample evidence supporting the ALJ's finding that he downplayed these projects at the hearing (Tr. at 16), including numerous references in the medical records to plaintiff's "keeping himself busy with home repairs," "rather extensive home improvement projects" and "working on his house" (see, e.g., Tr. at 230; 319; 322; 323; 330; 331; 334; 343; 345), with no limitations on his involvement expressed.[13]

Plaintiff complains that the ALJ failed to explain how the records showing that his alcoholism was in remission, his mental status stable and his hypertension under control conflicted with his testimony. However, the ALJ did not cite these records to prove that plaintiff was incredible; she cited them to demonstrate that his conditions were stable, and he was able to work in spite of them.

Plaintiff also contests the ALJ's statement that he did not receive treatment for pain. He points to one record where he reported leg pain, which the VA staff person stated was controlled with "current medication and/or treatment." (Tr. at 340.) This record does not support the notion that plaintiff received specific treatment for pain, certainly not significant and ongoing treatment. The balance of the record is bereft of any such references. Plaintiff speculates that he was not provided pain medication because of his alcoholism. The record shows that plaintiff's doctors did refuse to prescribe sleep medication for six months during plaintiff's early recovery (Tr. at 156), but there is no evidence that plaintiff sought and was denied pain medication due to concerns about his sobriety.

Plaintiff further complains that the ALJ failed to consider occasions when his blood sugar readings were out of range, or his complaints of leg and hand numbness. However, plaintiff

---

[13]At one point plaintiff told his dietician that his activity level would increase with all of the home re-modeling he planned to do. (Tr. at 321.)

did not testify to limitations based on his blood sugar readings, and the record is replete with statements that plaintiff's diabetes was under good control. (Tr. at 337.) The medical records also indicate that plaintiff had normal muscle strength in his upper and lower extremities (Tr. at 88), "no vocational limitations related to [his] diabetes" (Tr. at 89), and no "numbness or tingling" (Tr. at 337). Plaintiff notes the ALJ cannot reject testimony just because it is not fully supported by the objective medical evidence. See Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004). However, it is certainly appropriate for the ALJ to consider the objective medical evidence as one of the relevant factors. See SSR 96-7p. Nor has plaintiff demonstrated that the ALJ's failure to specifically mention "good" and "bad" days warrants remand. Plaintiff admitted that, prior to being laid off, he never missed work based on his mental impairments, even though his symptoms were just as bad then. (Tr. at 368.)[14]

## E.   VE Testimony/SSR 00-04p

Next, plaintiff argues that the ALJ failed to ensure that the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"), as required by SSR 00-4p.[15] Although the ALJ asked the VE to indicate if her testimony varied from the DOT (Tr. at 374), plaintiff

---

[14]Quoting the ALJ's statement that he was not "so impaired as to be incapable of engaging in any substantial gainful work activity" (Tr. at 16), plaintiff contends that, at his age, he did not have to prove himself incapable of any work. It appears that the ALJ was simply referring to the general statutory standard under 42 U.S.C. § 423(d). Further, plaintiff fails to develop an argument as to the significance of his age under the Grid.

[15]That Ruling states: "Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency."

31

contends that she failed to do so because the DOT does not list jobs with all of the hypothetical elements identified by the ALJ. Specifically, the DOT does not include information about contact with the public and interaction with supervisors and co-workers.

I see no error in this regard. Plaintiff cites no authority for the proposition that the ALJ cannot fulfill her duty under SSR 00-04p via a prefatory directive to the VE to point out any inconsistencies with the DOT.[16] Further, SSR 00-04p recognizes that the VE "may be able to provide more specific information about jobs or occupations than the DOT." "Information about a particular job's requirements or about occupations not listed in the DOT may be available . . . from a VE's or VS's experience in job placement or career counseling." SSR 00-04p. There is thus nothing inappropriate in the VE using her knowledge to supplement the job descriptions in the DOT. Indeed, it would appear that this is a primary reason for calling a VE.[17]

## F.    SSR 06-03p

Finally, plaintiff complains that the ALJ failed to consider the VA decision finding him 100% disabled, as required by SSR 06-3p. SSR 06-3p provides:

> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency.

---

[16]Requiring the ALJ to ask the VE about conflicts with the DOT each and every time the VE identifies a job would appear to place a needless burden on both. This is particularly true where the claimant is represented by counsel, who can object to improper testimony as it comes in.

[17]Plaintiff argues that under this theory there could never be a conflict with the DOT. I disagree. SSR 00-4p specifically permits the VE to provide additional information about jobs listed in the DOT, or about jobs not listed in the DOT. Additional information is not the same as contrary information.

32

However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

The problem with plaintiff's argument is that the VA decision appears nowhere in the record. The fact that plaintiff was found disabled by the VA is mentioned at various points in the medical records, but the decision itself is not in the administrative transcript.[18] The ALJ "cannot be faulted for failing to consider evidence that was not presented to" her. Indoranto v. Barnhart, 374 F.3d 470, 473 (7th Cir. 2004).[19]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 6th day of August, 2007.

/s Lynn Adelman

_____

LYNN ADELMAN
District Judge

---

[18]Plaintiff notes that the medical records which mention this award were before the ALJ. (Tr. at 325.) However, SSR 06-3p refers to decisions from other agencies. It is undisputed that the VA decision was never presented to the ALJ, even though plaintiff was represented by counsel at the hearing. See Glenn v. Secretary of Health & Human Services, 814 F.2d 387 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits.").

[19]Likewise, I cannot assume that failure to consider this decision is harmful. As the Seventh Circuit has noted, the VA employs a more lenient disability standard than does the SSA. Thus, such decisions are entitled to limited weight in determining disability under the Social Security Act. See Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006). Further, given the findings of VA nurse practitioner Schwallie, who stated that plaintiff had no service connected condition that would impose work restrictions (Tr. at 89), it is difficult to discern the basis for the VA's conclusion. Even Dr. Franklin's more favorable report mentioned only "moderate residual symptoms . . . with some occupational and social impairment." (Tr. at 86.)

33